**No. 25-1787**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

VICTIM RIGHTS LAW CENTER; TARA BLUNT; T.R., by and through his parent, Tara Blunt; KAREN JOSEFOSKY; A.J., by and through his parent, Karen Josefosky,
*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of Education; CRAIG TRAINOR, in his official capacity as Acting Assistant Secretary for Civil Rights,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 25-cv-11042
The Honorable Myong J. Joun

## RESPONSE OF PLAINTIFFS-APPELLEES
## TO MOTION FOR STAY PENDING APPEAL

L. Reid Skibell
Jonathan Friedman
GLENN AGRE BERGMAN & FUENTES, LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 970-1600
rskibell@glennagre.com
jfriedman@glennagre.com

Sean Ouellette
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
 (202) 797-8600
souellette@publicjustice.net

Counsel for Plaintiffs-Appellees

## INTRODUCTION

For over forty years, children have relied on the Department of Education's Office for Civil Rights (OCR) to protect one of their most basic rights: the "opportunity of an education" "on equal terms" with their peers, *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Congress charged OCR with enforcing landmark civil rights laws that protect students from discrimination. Plaintiff Victim Rights Law Center (VRLC)'s clients count on OCR's process when schools ignore sexual assaults that upend their education. Plaintiffs T.R. and A.J. turned to OCR for relief after violent racial and disability-based harassment forced them out of public school. They needed OCR's help to go back to public school safely.

Five months ago, the Secretary of Education crushed any hope they would get that relief. On March 11, she initiated an unprecedented reduction in force (RIF) that cut OCR's workforce in half, to the lowest level in history. There is no evidence that the Secretary considered the RIF's likely effects on OCR's work—or on the students who count on it to fulfill its statutory mandates. Yet, the RIF left T.R., A.J., and many other students without equal access to education. To prevent further harm while the case proceeds, the district court stayed the RIF as to OCR and

1

directed the government to restore OCR's staff to the status quo.

After waiting two months to appeal while it defied the injunction, the government now asks for an "emergency" stay. It relies largely on an unsigned, unexplained order on the Supreme Court's emergency docket that stayed a far broader injunction—which enjoined the RIF across the whole department—in response to different claims of harm by different plaintiffs. The Court should deny the motion.

As the district court found, *McMahon v. New York* does not control this case. The students and VRLC have suffered unique injuries that provide different, stronger arguments for standing and irreparable harm than the states, school districts, and unions pressed in *New York*. The RIF stalled T.R. and A.J.'s OCR investigations and delayed the relief they need to return to public school. And the narrower injunction here, which requires OCR to restore only a small fraction of employees reinstated in *New York*, places a far lighter burden on the government.

There is no basis for a stay in this case. The government barely defends the Secretary's decision on the merits, and none of the doctrines it invokes bar judicial review. If allowed to proceed, the RIF would leave thousands of students with no path to the equal educational opportunity

Congress designed OCR to protect. The injunction imposes no burden that could outweigh the harm those students will suffer. Indeed, it only restores OCR's workforce to a level that every past administration in OCR's history has deemed necessary to meet its mandates.

The need to ensure respect for the judicial process also cuts against a stay. Months after the district court ordered it to restore OCR, the department has yet to return a single affected employee to work. Instead, department officials have repeatedly pledged to proceed with the RIF departmentwide despite the injunction, even requiring OCR employees to return their work equipment. Based on the unrebutted evidence in the record, the district court found that the defendants have failed to comply with the injunction. This Court should not reward that noncompliance with extraordinary equitable relief.

## BACKGROUND

1. Forty years ago, Congress created OCR to ensure "equality of educational opportunity for every American" by "effectively carrying out the nation's civil rights laws in education." S. Rep. 96-49, 11, 35 (Mar. 27, 1979). Title VI and Title IX direct OCR to "effectuate" their bans on race and sex discrimination. *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C.

Cir. 1973); Dkt. No. 40 (Op.) 3-4.[1] By regulation, it must promptly investigate and resolve claims of race, sex, or disability discrimination. Op. 4-5. For decades, OCR has consistently concluded that it needs between 500-800 workers to meet those mandates. Op. 29; Dkt. No. 20-13 at 15.

2. Five months ago, the Secretary announced a RIF that cut OCR's workforce in half and closed seven of its twelve regional offices. Op. 1, 10-11. The mass termination "leaves OCR with the capacity to address only a small fraction of the complaints that it receives, making it impossible for OCR to comply with its statutory and regulatory obligations." Op. 11. Even before the RIF, OCR warned Congress that its staffing levels had "not kept pace with case demand." Dkt. No. 20-13 at 16. The agency's backlog had ballooned: In the four years before the RIF, the agency received over 14,000 more cases than it resolved. Dkt. No. 20-11 at 6-7. Investigators carried "untenable" loads of 50-80 cases each, Dkt. No. 20-1 (Lhamon) ¶¶ 26-27, which the RIF has doubled. Op. 34. The Secretary did not explain how OCR could process that record backlog with only half the workforce OCR had long deemed necessary. *See* Dkt. No. 20-6.

---

[1] Page numbers refer to those generated by ECF.

The fallout is devastating. "Many OCR cases," like T.R. and A.J.'s, "are time-sensitive and involve the ongoing educational needs of children, often affecting their access to education altogether." Op. 12, 34-35. Because of the RIF, however, "most of the students behind" OCR's 12,000 active investigations "will never receive meaningful relief." Op. 12.

3. A group of states, school districts, and teachers' unions sued to enjoin the RIF departmentwide. *New York v. McMahon*, No. 25-cv-10601, 2025 WL 1463009, at *1 (D. Mass. May 22, 2025). The district court held they had standing based on claimed delays in receiving federal money. *Id.* at *17-19. It blocked the RIF departmentwide and directed the department to reinstate all 1,400 affected employees. *Id.* at *40. It also enjoined a presidential order directing the Secretary to facilitate the department's closure "consistent with applicable law." *Id.* After this Court denied a stay pending appeal, *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 67 (1st Cir. 2025), the government applied to the Supreme Court. Appl. for Stay, *McMahon v. New York*, No. 24A1203 (filed June 6, 2025) ("*New York* Appl.").

Before the Supreme Court, the government principally argued that the *New York* plaintiffs lacked standing because the financial harms they

5

alleged were too speculative: They did not "identify any funding that has been delayed or canceled due to the RIF"; they only "fear[ed]" future delays that were uncertain to happen. Reply Supp. Appl. for Stay 4-5, *McMahon v. New York*, No. 24A1203 (filed June 16, 2025) ("*New York* Reply"); *see New York* Appl. 15-25. Although the plaintiffs claimed informational injuries—a loss of guidance from the department—the government argued those were not cognizable harms because no law entitled the plaintiffs to the information they sought. *New York* Reply 6-7. And it argued that the plaintiffs' primary injury, their "feared losses of funding," was not irreparable because the plaintiffs could recover the money later through the Court of Federal Claims. *New York* Appl. 38.

In response, the plaintiffs "all but abandon[ed] their allegations relating to the Office for Civil Rights." *New York* Reply 7-8. The teachers' unions said their members sometimes "file complaints with OCR," but unlike the plaintiffs here, they did not point to any pending complaint. *See* Opp'n of Somerville Pub. Schs. to Appl. for Stay 13, *McMahon v. New York*, No. 24A1203 (filed June 13, 2025) ("Somerville Opp'n"). The states argued that the RIF forced them "to dedicate greater resources to civil rights enforcement," Opp'n of State Pls. to Appl. for Stay 11, 23,

*McMahon v. New York*, No. 24A1203 (filed June 13, 2025) ("States Opp'n"), and the school districts argued they would lose OCR's guidance about how to comply with federal law. Somerville Opp'n 13, 26-28. But the government responded that these injuries were not judicially cognizable: The federal laws do not obligate states "to replace all federal enforcement with their own," *New York* Reply 8, or entitle the states and school districts to the information they sought. *Id.* at 7.

As to the scope of relief and the equities, the government stressed the breadth of the *New York* injunction, making arguments it cannot make here. *See New York* Appl. 33, 35-39. It argued that departmentwide relief was too broad because the plaintiffs "allege[d] adverse effects on only certain departmental services carried out by specific employees," *id.* at 14, and the Court did not "tailor its reinstatement order to restore any particular function or functions upon which respondents allege they rely," *id.* at 33. Moreover, the departmentwide injunction reached functions that were "discretionary" and not "statutorily mandated." *Compare id.* at 33 *with* Dkt. No. 25 (making no such argument here).

Unlike here, where the government did not claim the narrower injunction would impose a significant financial burden, its brief in *New*

7

*York* stressed the "complex and costly challenges" of "re-onboard[ing]" "nearly 1400 workers" departmentwide, *New York* Appl. at 36-38.

On July 14, the Supreme Court stayed the *New York* injunction in an unexplained order. *McMahon v. New York*, 145 S. Ct. 2643 (2025).

4. Plaintiffs filed this case on April 21, while *New York* was pending and before this Court granted the injunction there. Dkt. No. 1. Plaintiffs are two students and their families and a legal advocacy organization. Unlike in *New York*, they have pending, unaddressed complaints with OCR, and they challenge the RIF only as to OCR.

Plaintiffs T.R. and A.J. were forced out of public school due to violent racial and disability-based harassment. Students called T.R. racial epithets almost daily, including "n*gger." Dkt. No. 20-15 (Blunt) ¶¶ 4-8. They pushed him down and stomped his head on the ground, where a teacher found him crying in the fetal position. Op. 13. Students attacked A.J., a fourth-grader with a life-threatening allergy, with his allergens. Op. 14. Because T.R. and A.J.'s schools would not stop the abuse, their parents had to withdraw them from public school. Op. 13-15. They filed complaints with OCR, but those complaints stalled due to the RIF. Op. 17. A.J. settled his claims through private mediation. Dkt. No. 60 n.1.

8

T.R.'s complaint remains unresolved, and he will have to attend private school yet again this fall. Dkt. No. 20-15 (Blunt) ¶ 16.

VRLC is a legal organization that represents survivors of sexual violence in OCR investigations. Op. 15. All of its complaints were pending in OCR's Boston office, which the RIF closed. Dkt. No. 20-17 (Malone) ¶¶ 11-12. VRLC has heard nothing since then, despite asking for updates. Op. 15. Because of the RIF, VRLC has had to turn down clients for whom OCR was the only path to recourse. Op. 20. And it has sunk hours of time into responding to requests from attorneys nationwide who need to know where to seek relief now that OCR is unlikely to provide the resolutions their clients need. Op. 16; Dkt. No. 20-17 (Malone) ¶¶ 17-31.

5. On June 18, the district court found that "Plaintiffs' case warrant[ed] a separate decision" and injunction to address the "unique harms" they have suffered due to the RIF. Op. 2. It ordered the government, among other things, to "take all steps necessary to facilitate" the OCR employees' return to duty. Op. 42-43.

6. Well over two months after the district court entered the injunction, the government has yet to return a single OCR employee to duty. Rather, department officials pledged to continue the RIF

9

departmentwide. The day the *New York* order issued, the Secretary announced without qualification that the department would "carry out the reduction in force." Dkt. No. 55-1. On cue, the department emailed affected OCR employees that their "separation date" was "August 1, 2025." Dkt. No. 47-1 (Oglesby) at 3; *see* Dkt. No. 55-2 (Gonzales) ¶ 13. It sent boxes to OCR employees to return their work equipment. Dkt. No. 59-1 (Oglesby) ¶ 6; Dkt. No. 55-3 (Joseph) ¶ 9. Former OCR officials testified that the government had no reasonable excuse for its delay in returning staff to work as ordered. *See* Dkt. Nos. 55-2 (Gonzales), 55-3 (Joseph).

7. On July 21, the government moved to vacate or stay the injunction pending appeal. Dkt. No. 48. The district court denied that motion based on the distinctions between this case and *New York* and the government's noncompliance with the injunction. Dkt. No. 60.

## ARGUMENT

A stay is an "intrusion into the ordinary processes of administration and judicial review." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation omitted). The government does not meet its burden to justify one.

I.     *New York* **does not control this case.**

In *New York*, the Supreme Court stayed a far broader, depart-mentwide injunction in response to different claims of harm by different plaintiffs with no pending OCR complaints, who "all but abandon[ed] their allegations relating to [OCR]" before the Supreme Court. *New York* Reply 7-8. The Court gave no reasons. When the Supreme Court enters such an order, "no more may be read into" it "than was essential to sustain" it. *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983). Any precedential effect "extends no further than the precise issues presented and necessarily decided by" the order. *Id.* (citation modified). The stay did not "necessarily decide[]" this case, which is distinct from *New York*.

1. **Harms**. The students and VRLC have "unique harms" that provide different grounds for standing and irreparable harm than the states, school districts, and unions pressed in *New York*. Op. 2.

Unlike the plaintiffs in *New York*, who arguably did not identify "any funding that has been delayed or canceled due to the RIF" and had no live complaints with OCR, *New York* Reply 4-8, T.R. is excluded from public school *now*. Op. 17, 36. And by stalling his OCR investigation, the RIF has delayed the relief he needs to return. Op. 17, 36. The government

11

does not dispute that this was (and is) a "procedural injury" that the states, school districts, and teachers' unions in *New York* did not even allege. Op. 17. VRLC, too, has distinct injuries that those plaintiffs did not claim to suffer. *See* Op. 37-40.

And unlike *New York*, where the government argued the plaintiffs would not suffer irreparable harm because they could recover their money later, *New York* Appl. 38, it cannot dispute that T.R. can never recover his lost educational opportunities. *See* Op. 36. Nor can VRLC recover the clients, time, and trust it will lose. Op. 37-40.

2. ***Burdens***. The injunction in this case is far less burdensome than the departmentwide mandate in *New York*: It does not compel the government to pay and re-onboard "nearly 1400 employees" departmentwide. *New York* Appl. 14, 34-39. It affects a small fraction of those employees and only one office, OCR. Op. 4, 34-36. And unlike the *New York* order, which arguably covered departmental components that were not mandated by statute and which had "no conceivable link to [the plaintiffs'] asserted injuries," *New York* Appl. 22, the government does not dispute that federal law gives OCR a mandate that plaintiffs need it to fulfill. Op. 27-29, 36-41. Here, unlike in *New York*, the district court found

12

that OCR has consistently maintained it needs at least twice as many employees to meet that mandate. Op. 29. And here, the government did not even claim that financial costs or re-onboarding burdens militated against an injunction. *See* Dkt. No. 25 at 32.

3. ***Merits***. On the merits, too, the court's decision here rested on several grounds unique to OCR and the record here, including OCR's longstanding position that at least 500 full-time-equivalent employees were "necessary" to meet its mandates. Op. 29-33.

Given these differences, the order here is no "affront to the Supreme Court's authority," Mot. 10. In *New York*, unlike in the cases the government cites, the Court chose not to announce any reasoning that could "control[]" or "inform" other cases, even though this case was already pending. *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (quoting controlling language from prior written opinion); *Gateway City Church v. Newsom*, 141 S. Ct. 1460, 1460 (2021) (relying on decision in which six justices explained their votes to grant stay). That choice reflects a decision *not* to set precedent that could "predetermine" other cases. *Labrador v. Poe*, 144 S. Ct. 921, 933-34 (2024) (Kavanaugh, J., concurring). Respect for the Supreme Court's decision-making entails respect for that decision,

13

too. Courts do not protect the "rule of law" by overreading shadow docket orders that announce no rule of law. Mot. 10.

## II.    The government does not satisfy the stay factors.

For a stay, the government must (1) make a "strong showing" it "is likely to succeed on the merits" and demonstrate that (2) it "will be irreparably injured absent a stay," (3) the stay will not "substantially injure the other parties interested in the proceeding," and (4) "the public interest lies" with a stay. *Nken*, 556 U.S. at 427. It does not carry that burden.

### A. The government is not likely to succeed.

#### 1. The plaintiffs have standing.

The district court correctly found standing.

1. ***T.R. and A.J.*** The government claims the district court found only that the RIF was "likely" to cause the plaintiffs redressable injuries. Even if that were all the court found, standing requires no more: A plaintiff need only show that the government "has caused or *likely* will cause" him an "injury in fact." *F.D.A. v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024) (emphasis added).

But the district court went further. It found that the RIF had already "stall[ed]" the students' OCR investigations, delaying the relief

14

they needed to safely return to public school. Op. 17, 34-36. That finding rests on an extensive record. For years, OCR maintained that it needed at least 500 full-time-equivalent staff—almost twice the post-RIF workforce—to fulfill its mandates. Op. 29. OCR's staff has never dipped below that number. Dkt. No. 20-13 at 15. Multiple experienced OCR attorneys testified that the RIF would make it "impossible" for OCR to complete investigations within a reasonable time. Op. 19. The RIF closed the office handling A.J.'s complaint and flooded the office handling T.R.'s, doubling caseloads. Op. 18. None of the plaintiffs' investigations had progressed since the RIF. Op. 18. If the government had evidence that the plaintiffs' investigations were proceeding apace despite all this, it would have produced it. Instead, it did not submit *any* evidence below.[2]

The government suggests (at 13) that the students lack standing because they could try to compel OCR to complete their investigations under 5 U.S.C. § 706(1). But it cites nothing to suggest a court loses its power to grant the "relief that is sought" whenever the plaintiffs might

---

[2] The government suggests that the RIF did not cause the plaintiffs' harm because OCR froze investigations for a few weeks before the RIF. Mot. 13. But it has never disputed that the department lifted that formal pause before it initiated the RIF. Dkt. No. 1 ¶ 38.

hypothetically seek narrower relief through a different cause of action. Mot. 13. Anyway, a § 706(1) claim could not provide "complete relief," Mot. 13, to the plaintiffs because the RIF makes it impossible for OCR to complete investigations promptly. Op. 34-36.

2. **VRLC.** The district court correctly found the RIF "perceptibly impaired" VRLC's "core business activities" and "diverted [its] resources," which shows standing. Op. 20-21 & n.3. The RIF did not just require VRLC to change legal advice. *Contra* Mot. 14. It ended VRLC's practice of representing students in OCR investigations. Dkt. No. 20-17 (Malone) ¶ 14. As a result, VRLC "will be able to help fewer people." *Id.* ¶ 15.

And without a functioning OCR, VRLC has had to sink hours of time and resources into researching alternative remedies to advise professionals in states in which it is not—and can never feasibly become—an expert, as it was on the OCR process. Dkt. No. 20-17 (Malone) ¶¶ 21-27. Unlike the issue advocacy in *Hippocratic Medicine*, that is not just voluntary "public education," Mot. 14; it is advice VRLC *must* provide to comply with the conditions of its grant funding. *Id.* ¶¶ 5, 18.

"Such concrete and demonstrable injury to the organization's activities" with a "drain on the organization's resources" suffices to show standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

## 2. The CSRA does not preclude jurisdiction.

The government next argues that, without saying so, the Civil Service Reform Act (CSRA) provides that only a federal employee can challenge a RIF, no matter how much it harms the people Congress created the agency to serve. This Court rejected that position in *Somerville.* 139 F.4th at 71. The Supreme Court's stay in *New York* did not address that legal conclusion and does not overrule it.

This Court was right in *Somerville*. Courts do not "restrict access to judicial review" absent "clear and convincing evidence" that Congress intended to do so. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967). The CSRA does not even mention non-employees, let alone create the required "plain inference" that Congress meant to strip away their rights to sue. *Contra* Mot. 15. *United States v. Fausto* only proves the point: There, the Court held that the CSRA "displays a clear congressional intent" to preclude claims by covered *federal employees* because it "deals explicitly" with those employees—it gives them "attention" "throughout"

17

the statute—without granting them judicial review. 484 U.S. 439, 445, 447-48 (1988). The CSRA says nothing about regulatory beneficiaries.

*Block v. Community Nutrition Institute*—which construed a unique program that Congress designed to raise the price of milk by (among other things) giving milk producers, but not consumers, the right to go to court to ensure that the scheme's distinct "statutory objectives would be realized," 467 U.S. 340, 347 (1984)—lends the government no help here. *Block* does not suggest that Congress expected fired government employees to protect the rights of students when the government incapacitates the agency Congress designed to protect them. Op. 22.

### 3. The government does not show the APA and ultra vires claims are unlikely to succeed on their merits.

1. The government makes no developed argument that the RIF is unreviewable. It does not dispute that the RIF is a "discrete" and "final" agency action. *See* Mot. 17.[3] In a fly-by sentence, it says that "there is no meaningful standard against which [a court can] judge the agency's

---

[3] On this point, the government argues only that "to the extent that [the plaintiffs] seek wholesale judicial review of the Department's management of OCR," they do not challenge a discrete action. Mot. 17. Plaintiffs seek no such thing; they challenge only the RIF. Op. 24-25.

exercise of discretion." Mot. 17-18. But that is a "rare" and "narrow" exception to judicial review, *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019), and the government does not address any of the laws and policies the district court found set meaningful standards here. It does not dispute (1) that "the Secretary may not 'consolidate'" or "alter" OCR, (2) that OCR "must 'employ such officers and employees, including staff attorneys, as may be necessary to carry out [its] functions,'" and (3) that OCR must promptly investigate and resolve all potential violations of the laws it enforces. Op. 29 (quoting statutes and regulations). And it does not address the longstanding policies that provide benchmarks for "necessary" staff levels and "prompt" investigations. Op. 28-29; *see also Adams*, 480 F.2d at 1163 (holding court could review whether OCR was initiating enforcement actions within a "reasonable time"). This lack of development forfeits any challenge to the district court's reviewability holding.

2. Nor has the government made a "strong showing" that the Secretary's decision satisfied the APA's standards. The APA requires that agency action be "reasonable" and "reasonably explained," *Ohio v. E.P.A.*, 603 U.S. 279, 292 (2024), even in personnel matters, *Dugan v. Ramsay*, 727 F.2d 192, 193-94, 196 (1st Cir. 1984). The agency must "examine the

19

relevant data" and articulate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The government does not claim the Secretary did this. Instead, it handwaves that the "arbitrary and capricious" standard is "especially deferential" for personnel decisions. Mot. 18. But it does not explain how the Secretary's decision would satisfy even a "deferential" review. Mot 18.

Nor could it. There is no evidence that the Secretary assessed how the RIF would impact OCR's work or the students who count on it. Although the government asks the Court to trust that the Secretary "determined that OCR can perform its statutory functions with a lower headcount," it identifies no such determination in the record—much less any data she considered to reach that conclusion. Mot. 18, 20. Nor does it claim that the Secretary considered OCR's longstanding position that it needed twice the post-RIF workforce to do its job. *See F.D.A. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 918 (2025) ("[W]hen an agency acts inconsistently with an earlier position," it must at least "display awareness that it *is* changing position and offer good reasons for the new policy.") (citation modified). And it does not deny that the Secretary

"relied on factors" that Congress "did not intend [her] to consider," *State Farm*, 463 U.S. at 43: she initiated the RIF to facilitate the department's closure, *see* Dkt. No. 19 at 13; Dkt. No. 25 at 32, which conflicts with Congress's decision to create OCR and give it a job to do. Op. 3-5, 32.[4]

3. The government does not impeach the district court's conclusion that the RIF was contrary to law, either. It does not dispute that the RIF "alter[ed]" or "consolidat[ed]" OCR and its functions, which federal law forbids the Secretary to do. 20 U.S.C. § 3473(a)(1); Op. 33. And it does not cite any evidence—because it presented none—to undermine the district court's finding, made on an extensive record, that "the RIF leaves OCR with the capacity to address only a small fraction of the complaints that it receives," Op. 11, such that OCR "is unable" to comply with its mandate to promptly investigate all plausible complaints, Op. 23 n.5, 33.

4. Unable to defend the RIF on the merits, the government argues that the plaintiffs have no remedy because the APA does not authorize

---

[4] The Secretary's June 3 statement to Congress, made weeks after the plaintiffs filed this lawsuit, cannot possibly justify the RIF, which the statement does not even mention. *See* Op. 30; *D.H.S. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020) (explaining that agencies may not rely on "post hoc rationalizations").

"reinstatement." Mot. 19. The government forfeited this argument, too. And the order below does not require reinstatement because the terminations had not taken effect when the court stayed them. *See* Dkt. No. 20-10 (Hamlin) at 6. Anyway, the case the government cites did not foreclose reinstatement as a remedy: It held that the district court should not have reinstated a probationary employee while her administrative appeal was pending because her "temporary loss of income" was not "irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Here, in contrast, the RIF inflicts indisputable irreparable harm. Op. 34-41.

**B. The equities and public interest militate against a stay**.

1. A stay would inflict immeasurable harm on T.R., VRLC, and thousands of other vulnerable students who would "never receive meaningful relief" for discrimination in school if the RIF proceeds. Op. 12; *see Scripps-Howard Radio v. FCC*, 316 U.S. 4, 9 (1942) (explaining the court must consider "irreparable injury to the parties *or to the public*" (emphasis added)). Based on an extensive record, the district court found that OCR could not meet its undisputed statutory and regulatory mandates with half its staff. Op. 11, 35. There is "no public interest in the perpetuation" of such "unlawful agency action." *League of Women Voters v.*

*Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And the injunction is tailored to cure the violation: It requires OCR only to restore its staff to levels OCR has deemed necessary for years and maintained for decades, even when OCR had a much lower caseload. *See* Op. 29; Dkt. No. 20-13 at 15.[5]

Although the government promises the Secretary has now "determined that OCR can perform its statutory functions with a lower headcount," Mot. 20, it points to no "reasoned" or "reasonably explained" decision that would warrant deference. *Supra* pp. 19-20. Nor does the injunction interfere with any exercise of "prosecutorial" discretion. Mot. 20. The Secretary lacks any discretion over civil rights enforcement, which Congress vested in the head of OCR. Op. 26 n.7. And even he cannot choose to let potential violations go uninvestigated. Op. 25-26.

2. The government's two-month delay in "seeking a stay vitiates much of the force" of its claim of "irreparable harm." *Beam v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977). Its excuse below—that it hoped the Court would decide this case in *New York*—makes scant sense given the differences between that case and this one. If this more limited

_____

[5] The government's forfeited claim (at 20) about the salaries required to maintain those longstanding staffing levels does not outweigh the harm the RIF would inflict on students. *See* Dkt. No. 25 (raising no such claim).

injunction really caused the government "irreparable injuries" "[e]very day" it remained in effect, Mot. 20, the government would have moved to stay it sooner, as it has in other cases.

Instead, as the district court found, the government defied the injunction. Dkt. No. 60 at 4. That disregard for the court's orders independently justifies denial. *See Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (denying motion to vacate injunction movant defied). To reward the government's noncompliance with extraordinary equitable relief would undermine respect for the judiciary.

3. Even as it argues below that "[p]laintiffs would have no right to compel OCR to act on their complaints," Dkt. No. 66 at 3, the government here claims that the plaintiffs have not suffered "irreparable injury" because they could sue "to compel that action." Mot. 20-21. The government forfeited this argument, but it fails anyway. A § 706(1) claim would not assist students if OCR lacks the capacity to investigate their complaints. And nothing requires the plaintiffs to demand that OCR divert its diminished resources to them over others who deserve redress.

Rather, the APA allows them to challenge the "discrete agency action"—the RIF—that is the cause of their harm, and it prescribes the

appropriate remedy: the court "shall" "set aside" that unlawful action. 5 U.S.C. § 706(2). Thus, when courts find agency action violates the APA, they routinely "vacate[]" the action as applied to everyone, not just "the individual petitioners." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). The district court properly maintained the status quo so it could award that relief at final judgment. *See Maryland v. U.S.D.A*, 770 F. Supp. 3d 779, 818 (D. Md. 2025) (collecting cases explaining that preliminary relief under § 705 should align with vacatur).

## CONCLUSION

The Court should deny the motion.

August 25, 2025                    Respectfully submitted,

/s/ *Sean Ouellette*
Sean Ouellette
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
souellette@publicjustice.net

L. Reid Skibell
Jonathan Friedman
GLENN AGRE BERGMAN
& FUENTES, LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 970-1600
rskibell@glennagre.com
jfriedman@glennagre.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,200 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 27(d)(1)(e) and 32(a)(5)–(6) because it was prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

Dated: August 25, 2025          */s/ Sean Ouellette*
                               Sean Ouellette
                               *Counsel for Plaintiff-Appellees*

27